**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION: CINCINNATI**

| | |
|---|---|
| NATIONAL CENTER FOR PUBLIC POLICY RESEARCH, <br><br> *Plaintiff,* <br><br> v. <br><br> THE KROGER CO., <br><br> *Defendant.* | Case No. 3:23-cv-00256 <br><br> Judge _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The National Center for Public Policy Research (the "National Center"), by its undersigned counsel, alleges as follows:

## NATURE OF THE CASE

1. The National Center brings this action for a declaratory judgment and injunctive relief to vindicate its right as a shareholder of The Kroger Co. ("Kroger" or "Defendant") to have Kroger include with its proxy materials a shareholder proposal submitted by the National Center (the "Proposal"), which Kroger wrongfully intends to exclude when it issues its proxy materials for Kroger's 2023

annual meeting of shareholders (the "2023 Annual Meeting") on or about May 7, 2023 (the "2023 Proxy Materials").[1]

2.      Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-8 promulgated thereunder, 17 C.F.R. § 240.14a-8 ("Rule 14a-8"), require Kroger to include the Proposal with the 2023 Proxy Materials. The National Center, along with Kroger's other shareholders, faces imminent and irreparable loss of its right to vote on the Proposal as a result of Kroger's decision to omit the Proposal from the 2023 Proxy Materials.

3.      The National Center is the beneficial owner of at least $2,000 of Kroger shares, and has been so continuously for over three years, and has complied with all of the procedures and requirements of Rule 14a-8, thereby fully perfecting its right to have the Proposal included in the 2023 Proxy Materials. None of Rule 14a-8's exceptions to a shareholder's right to have its proposal included are applicable. Accordingly, Kroger's decision to exclude the Proposal from the 2023 Proxy Materials is in violation of law.

4.      The Proposal asks Kroger to issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity policy. Ex.A.5 (attached).

---

[1] Pursuant to Rule 14a-8, Kroger had to file a no-action request no later than 80 calendar days before it expects to file its definitive proxy statement and form of proxy with the Securities and Exchange Commission (the "Commission"). Kroger filed its no-action request on February 16, 2023, and the 80-day period expires on May 7, 2023.

5.     Kroger has refused to include the Proposal in the 2023 Proxy Materials because it alleges that the Proposal falls within an exception specified in Rule 14a-8 to a shareholder's presumptive right to have a proposal included in the company's proxy materials. The exception on which Kroger relies is found in Rule 14a-8(i)(7), which states: "*Management functions*: [the proposal may be excluded if] the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). This part of Rule 14a-8 is commonly referred to as the "ordinary business exclusion."

6.     "The ordinary business exclusion has been called the 'most perplexing' of all the 14a-8 bars" and "[n]either the courts nor Congress have offered a corrective." *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 337 (3d Cir. 2015) (citation omitted). Instead, the interpretation of its meaning "has rested almost exclusively with the SEC." *Id.* (cleaned up).

7.     The SEC has noted that "ordinary business" is a "legal term-of-art" that "is rooted in the corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations." Amendments to Rules on Shareholder Proposals, Exchange Act Release No. 40018 (May 21, 1998) (hereinafter "1998 Amendments") (emphasis added), *available at* https://www.sec.gov/rules/final/34-40018.htm.

8.     In its most recent interpretation of the ordinary business exclusion, the SEC summarized that two considerations guide how to apply the ordinary business exclusion. "The first relates to the subject matter of the proposal. Certain tasks are

so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." According to the SEC, examples of this "include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers." 1998 Amendments, *supra*. "The second consideration relates to the degree to which the proposal seeks to 'micro manage' the company by probing too deeply into 'matters of a complex nature that shareholders, as a group, would not be qualified to make an informed judgment on, due to their lack of business expertise and lack of intimate knowledge of the (company's) business.'" *Id.* (citation omitted). It comes into play where "the proposal seeks intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies." *Id.*

9. From the outset of the modern ordinary business exclusion, the SEC has provided that the exclusion does not apply to "matters which have significant policy, economic, or other implications inherent in them," which are "considered beyond the realm of an issuer's ordinary business operations." Adoption of Amendments Relating to Proposals by Sec. Holders, Release No. 12999 (Nov. 22, 1976).

10. In the 1998 Amendments—which are the SEC's most recent interpretation of Rule 14a-8(i)(7)— the SEC interpreted the ordinary business exclusion to provide that "proposals relating to such [ordinary business] matters but focusing on sufficiently significant social policy issues (e.g., *significant*

4

*discrimination matters*) generally would not be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." 1998 Amendments, *supra* (emphasis added).

11.     Subsequent guidance in "staff legal bulletins" released by the SEC's Division of Corporation Finance (the "Division") have further expanded upon how the Division and its Staff apply the ordinary business exclusion to shareholder proposals that raise social-policy issues.

12.     The Division's longstanding position is that "the presence of widespread public debate" over an issue must be considered in determining whether the issue transcends ordinary business operations. Division of Corporation Finance, *Staff Legal Bulletin No. 14A (SLB-14A)* (July 12, 2002) *available at* https://www.sec.gov/interps/legal/cfslb14a.htm.

13.     In 2021, the Division issued *Staff Legal Bulletin No. 14L (SLB-14L)*, which explained even more forcefully that this inquiry does not "focus on . . . the nexus between a policy issue and the company, but will instead focus on the social policy significance of the issue that is the subject of the shareholder proposal," and thus turns on "whether the proposal raises issues with a broad societal impact, such that they transcend the ordinary business of the company." Division of Corporation Finance, *Staff Legal Bulletin No. 14L* (Nov. 3, 2021), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals. *SLB-14L* further re-emphasized the 1998 Amendments' direction that "[m]atters related to

employment discrimination" are an example of proposals that "may rise to the level of transcending the company's ordinary business operations." *Id.* at n.5.

14.    Kroger's position that the Rule 14a-8(i)(7) exception applies to the Proposal is contrary to both the plain language of the Rule and its consistent interpretation by the SEC and the Division.

15.    The Proposal does not relate to Kroger's ordinary business operations because (i) it calls only for a report; (ii) it is on a subject that addresses board-adopted, "company-wide" "human capital management" policy that affects not only Kroger's workforce (as a whole), but "prospective employees," "individuals," and the "half of Americans [who] live and work in a jurisdiction with no legal protections" against discrimination for political activity or viewpoint, Ex.A.3; and (iii) in any event, it focuses on the issue of employment discrimination based on viewpoint, which is an issue of immense social-policy significance and public debate that transcends ordinary business operations.

16.    To be sure, the Division's staff (the "Staff") issued a so-called "no-action letter" to Kroger, wherein the Staff states it believes there is "some basis" for Kroger's view that it may exclude the Proposal.[2] Ex.F.1.

---

[2] On April 28, 2023, the National Center filed a petition for review and emergency motion for stay of the SEC's no-action letter to Kroger in the United States Court of Appeals for the Fifth Circuit. The same day, the Fifth Circuit entered a temporary stay of the no-action letter and set a briefing schedule concluding on May 4, 2023. *See Nat'l Ctr. for Pub. Pol'y Res. v. SEC*, No. 23-60230 (5th Cir. 2023) (ordering temporary stay of SEC no-action letter).

17.     While some courts provide such no-action letters with a degree of deference, *see N.Y. City Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 14 (2d Cir. 1995) (noting no-action letters get some, but not "great," deference), this Court should not do so here. The Staff's no-action letter was contrary to the plain language of Rule 14a-8(i)(7) and its consistent interpretations by the SEC and the Division and unlawfully discriminated against the National Center's viewpoint.

18.     Accordingly, this Court should require that the Proposal be included in Kroger's 2023 Proxy Materials.

## JURISDICTION AND VENUE

19.     The claim asserted herein arises under and pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-8 promulgated thereunder. *See Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419–425 (D.C. Cir. 1992).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.

21.     This Court has personal jurisdiction over Kroger because its principal place of business lies within this District and it is organized under the laws of the State of Ohio.

22.     Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. § 1391(b) and (d). As noted above, Kroger's principal place of business lies in this District.

23.     In connection with the acts alleged in this complaint, Kroger, directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to, the mails and interstate telephone communications.

## THE PARTIES

24.     The National Center is a communications and research foundation that focuses on providing free market solutions to public policy problems. The National Center maintains its headquarters at 2005 Massachusetts Avenue N.W., Washington, DC 20036.

25.     Kroger is a publicly listed Ohio corporation and maintains its corporate headquarters at 1014 Vine St. Cincinnati, OH 45202. Kroger operates supermarkets and multi-department stores throughout the United States.

## BACKGROUND

### A.     Requirements Governing Shareholder Proposals

26.     In large publicly held corporations such as Kroger, most shareholders rarely attend the company's annual meeting. Therefore, in order for the company to obtain a quorum of shareholder votes sufficient to take actions necessary for it to conduct its business, including the consideration of proposals by its shareholders, the company must use "proxies," or forms by which a shareholder authorizes another person to vote his or her shares at the annual meeting.

27.     To obtain votes by proxy, the company sends out proxy materials, including a proxy solicitation and a voting card that contains the company's proposals for shareholder vote, well in advance of the annual meeting.

28.     Section 14(a) of the Exchange Act renders unlawful the solicitation of proxies in violation of the Commission's rules and regulations, which are codified at 17 C.F.R. § 240.14a-1 *et seq.*

29.     Rule 14a-8 provides the procedures for submitting shareholder proposals, prescribes when a company must include a shareholder's proposal in the company's proxy statement, and lists the circumstances under which a shareholder proposal may be excluded by the company.

30.     Rule 14a-8(b)(1) requires, among other things, that to be eligible to submit a proposal, the shareholder "must have continuously held . . . [a]t least $2,000 in market value of the company's securities entitled to be voted on the proposal at the meeting for at least three years" by the date the shareholder submits the proposal, and "continue to hold [those] securities through the date of the meeting."17 C.F.R. § 240.14a-8(b)(1)(i)(A), (ii). If a shareholder is not the registered holder of the securities, Rule 14a-8(b)(2) stipulates that the shareholder must prove its eligibility to the company. One way of so doing is "to submit to the company a written statement from the 'record' holder of [the] securities (usually a broker or bank) verifying that, at the time [the shareholder] submitted [the] proposal, [the shareholder] continuously held" the securities for at least three years. 17 C.F.R. § 240.14a-8(b)(2)(ii)(A). The shareholder "must also include . . . [a] written statement that [it] intend[s] to continue to hold the securities through the date of the meeting of shareholders." *Id*. Procedurally, the rule requires that shareholder proposals, along with any "supporting statement" the shareholder would like

included alongside the proposal, be limited to 500 words, 17 C.F.R. § 240.14a-8(d), and must be submitted to the company no later than 120 days before the date the company's proxy statement for the previous year's annual meeting was released to shareholders. *See* 17 C.F.R. § 240.14a-8(e)(2).

31.     If a shareholder satisfies these eligibility and procedural requirements, Rule 14a-8 permits the company to exclude the offered shareholder proposal only if the company demonstrates, with the burden of persuasion on the company, Rule 14a-8(g), that the shareholder proposal falls within at least one of the Rule's thirteen specifically enumerated exclusions. *See* Rule 14a-8(i). If the company fails to meet its burden, assuming the shareholder is eligible and has met the procedural requirements for Rule 14a-8, the company must include the proposal with its proxy materials.

32.     One of Rule 14a-8's bases for exclusion is Rule 14a-8(i)(7), which provides that a company may exclude a proposal "[i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. 240.14a-8(i)(7). This basis for exclusion is commonly referred to as the "ordinary business exclusion."

33.     A predecessor of the ordinary business exclusion allowed companies to exclude proposals that would "consist[] of a recommendation, request, or mandate, that action be taken with respect to any matter, including a general economic, political, racial, religious, social, or similar cause, that is not significantly related to

the business of the issuer."[3] This rule "followed the seminal case of *Dodge v. Ford Motor Company*, in which the Michigan Supreme Court declared that 'a business corporation is organized and carried on primarily for the profit of the shareholders.'" James R. Copland, *Getting the Politics Out of Proxy Season*, Wall St. J. (Apr. 22, 2015).

34.     In 1976, the SEC replaced this provision—while declaring to "retain [its] substance"—by adopting the modern ordinary business exclusion. *See id*; Adoption of Amendments Relating to Proposals by Security Holders, Release No. 12, 999, 1976 WL 160347, at *10 (Nov. 22, 1976).

35.     In 1992, the Division applied the ordinary business exclusion in *Cracker Barrel Old Country Store, Inc.* The Division stated its view that the exclusion allowed the company to block a proposal that requested the company "implement non-discriminatory policies relating to sexual orientation and to add explicit prohibitions against such discrimination to their corporate employment policy statement." 1992 WL 289095, at *6 (Oct. 13, 1992). The Staff noted that, in several previous cases, the Staff had departed from the "general view that employment matters . . . are excludable as matters involving the conduct of day-to-day business" and made "exceptions" for certain "'social policy' concerns." *Id*. at *1. With *Cracker Barrel*, the Staff clarified that under Rule 14a-8(i)(7), a proposal's

[3] Proposed Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Sec. Holders (S7-643)., Release No. 9343, 1976 WL 160410, at *6 (July 7, 1976).

focus on a "social issue" did not "remov[e] the proposal from the realm of ordinary business operations." *Id*.

36. After *Cracker Barrel Old Country Store, Inc.*, Democrat SEC Commissioners and activist groups criticized the decision to enforce the ordinary business exclusion to categorically preclude social-issue proposals related to employment, and pushed for changes in the SEC's interpretation of the ordinary business exclusion in order to permit greater proxy inclusion for social-issue proposals. *See, e.g.*, Steven Wallman, *Equality Is More Than "Ordinary Business,"* N.Y. Times (Mar. 30, 1997).

37. In 1998, the SEC responded to that pressure and reversed course. Noting "changing societal views" and that "the relative importance of certain social issues relating to employment matters has reemerged as a consistent topic of widespread public debate," the SEC reconsidered its approach adopted in *Cracker Barrel* in a combined rulemaking and interpretive release. 1998 Amendments, *supra*. In the interpretive release, the SEC adopted changes to "reverse the *Cracker Barrel*" decision and narrow the ordinary business exclusion in order to prevent companies from excluding proposals that "focus[] on sufficiently significant social policy issues."

38. In 2021, the SEC signaled it would allow more social-issue proposals to be included in proxy materials. The Division issued *SLB-14L*, which explained even more forcefully that this significant social-policy exception does not "focus on . . . the nexus between a policy issue and the company, but will instead focus on the social

policy significance of the issue that is the subject of the shareholder proposal," and thus turns on "whether the proposal raises issues with a broad societal impact, such that they transcend the ordinary business of the company." *SLB-14L*, *supra*. *SLB-14L* further re-emphasized the 1998 Amendments' direction that "[m]atters related to employment discrimination" are an example of proposals that "may rise to the level of transcending the company's ordinary business operations." *Id.* at n.5.

39.     Further, the Division's longstanding position is that "the presence of widespread public debate" over an issue must be considered in determining whether the issue transcends ordinary business operations. Division of Corporation Finance, *Staff Legal Bulletin No. 14A (SLB-14A)* (July 12, 2002) *available at* https://www.sec.gov/interps/legal/cfslb14a.htm.

40.     Accordingly, the Staff has consistently denied companies no-action relief for proposals that focus on risks of employment discrimination. *See, e.g.*, *Levi Strauss & Co.*, 2021 WL 5918662 (Feb. 10, 2022) ("audit analyzing the Company's impacts on civil rights and non-discrimination" in "workplace and employment practices"); *The Walt Disney Co.*, 2021 WL 5052838 (Jan. 19, 2022) ("workplace non-discrimination audit"); *Amazon.com, Inc. (N.Y. State Common Ret. Fund)* (Apr. 7, 2021), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2021/ nyscrfamazon040721-14a8.pdf ("racial equity audit analyzing Amazon's impacts on

civil rights, equity, diversity and inclusion" and discussing "discrimination against Black and Latino workers").[4]

41.     Most significantly, in *CorVel Corp.*, 2019 WL 1640021, the SEC determined that a proposal was *not* excludable where it requested a company to "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity (EEO) policy."

42.     *CorVel Corp.* was but a more recent example of the same kind of "equal employment opportunity" focused shareholder proposal that, in the over two decades since the 1998 Amendments reversed *Cracker Barrel* to permit the consideration of "significant discrimination matters," have been a standard model that liberal activist groups advance at companies, and which courts and the SEC have approved. *See, e.g.*, *Apache Corp. v. New York City Employees' Ret. Sys.*, 621 F. Supp. 2d 444, 451 n.7 (S.D. Tex. 2008) ("Had the [proponent] drafted the Proposal to simply request that Apache add sexual orientation to its existing anti-discrimination policy and deleted [extraneous matter], the court would be inclined to agree with the [proponent]."); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 892 (S.D.N.Y. 1993); *Exxon Mobil Corp.*, 2000 WL 364043 (Mar. 23, 2000) ("amend ExxonMobil's written equal employment

---

[4] The no-action decision in *Amazon.com, Inc.*, *supra*, was not delivered by letter. *See* 2020–21 Shareholder Proposal No-Action Responses Chart, SEC, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/shareholder-proposal-no-action-responses-2020-2021.htm.

opportunity policy to bar sexual orientation discrimination"); *Wal-Mart Stores, Inc.*, 2021 WL 389304 (Feb. 23, 2021).

### B.   The National Center's Shareholder Proposal

43.   On December 21, 2022, the National Center notified Kroger that the National Center was submitting a shareholder proposal and that the National Center intended to present the Proposal at Kroger's 2023 Annual Shareholders' Meeting (the "Annual Meeting"). Ex.A.1.

44.   The Proposal sought to ensure transparent oversight by Kroger of the risks associated with failing to prevent discrimination against its employees on the basis of viewpoint or ideology:

**RESOLVED**

Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting 'viewpoint' and 'ideology' from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

Ex.A.3.

45.   The Proposal's supporting statement provided further that "Kroger does not explicitly prohibit discrimination based on viewpoint or ideology in its written EEO policy," which indicated the absence of a "company-wide best practice EEO policy" that "sends mixed signals to company employees and prospective employees." *Id*. It provided examples indicating a pattern that "individuals with conservative viewpoints may face discrimination at Kroger," such as Kroger "kowtow[ing] to leftwing social media criticism by removing patriotic and Second

15

Amendment related paraphernalia" and "release[ing] an 'allyship guide' that told employees to use 'inclusive language' and celebrate transgender holidays . . . [and] asserts that, 'Some people's morality can be a barrier to accepting LGBTQ+ people.'" *Id*. at 3–4. It also cited "a recent settlement [by Kroger] with fired employees who refused to wear a Company issued apron adorning a rainbow on account of it violating their religious beliefs." *Id*. at 4.

46.     The National Center modeled the Proposal and Supporting Statement on *CorVel Corp.*, which the Staff had previously said was *not* excludable under Rule 14a-8(i)(7). The *CorVel Corp.* proposal requested that the company "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity (EEO) policy." *See CorVel Corp.*, 2019 WL 1640021 (June 5, 2019). The National Center's proposal text was identical, except it substituted "viewpoint" and "ideology" for "sexual orientation" and "gender identity." Ex.C.11.

47.     In submitting the Proposal, National Center established its eligibility and compliance with the procedural requirements of Rule 14a-8.

48.     The National Center submitted the Proposal on December 21, 2022, which was no later than 120 calendar days before Kroger's annual meeting in the previous year (June 23), and the Proposal was less than 500 words in length. Ex.A.1.

49.     When the National Center submitted the Proposal, the National Center was the beneficial owner of at least $2,000 worth of the Kroger shares and

had beneficially owned at least that amount continuously for more than three years prior to December 21, 2022. Ex.A.5. The National Center provided to Kroger a proof of ownership letter dated December 28, 2022, from UBS Financial Services, a Depository Trust Company participant and the custodian and holder of record of the National Center's shares of Kroger stock, certifying this ownership information. *Id*. The National Center also represented its intent to hold those shares through the date of the Annual Meeting. Ex.A.1.

### C. Kroger's Rejection of the Proposal and the Staff's No-Action Letter.

50.     On February 16, 2023, Kroger sought no-action relief by sending a letter to the Division. Ex.B.

51.     In its letter to the Division, Kroger stated its intention to omit the Proposal from the 2023 Proxy Materials. Kroger stated that it could exclude the Proposal pursuant to Rule 14a-8(i)(7) because the Proposal deals with matters relating to Kroger's ordinary business operations. Specifically, Kroger argued that the Proposal pertains only to "Kroger's management of its workforce and policies concerning employees." *Id*. at 4. Kroger also argued that the Proposal did not implicate a "significant policy issue" for the same reasons. *Id*. at 5.

52.     On March 2, 2023, the National Center responded to Kroger's no-action request. Ex.C. In its response, the National Center pointed out that the SEC itself has held that "'significant discrimination matters'" "'transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote'" and thus proposals on such matters should not be excluded.

*Id*. at 3 (quoting 1998 Amendments, *supra*). The National Center also argued that the Division's *SLB-14L* had even more clearly privileged those "proposals squarely raising human capital management issues with a broad societal impact," regardless of whether they raised a policy of significance "for the company" specifically. *Id*. at 5.

53.     The National Center also cited extensive statistics about the existence of viewpoint and ideological discrimination, as well as the social significance and public debate over that issue. For example, according to a recent Society for Human Resource Management study, the percentage of American workers who say they have experienced political affiliation bias in the workplace *doubled* from 2019 to 2022. Ex.G.17. And an Economist/YouGov poll revealed that 79% of conservatives felt conservatives face "a great deal" or "a fair amount" of discrimination in America today, and a Hill-HarrisX survey found that 78% of Republicans believe conservatives "have to deal with discriminatory behavior" whereas just 16% of Democrats felt the same way. Ex.C.7.

54.     On April 12, 2023, the Division's "Rule 14a-8 Review Team"—to the National Center's knowledge, a new moniker for the Staff—issued a no-action letter informing Kroger that there appeared "to be some basis" for its view that it could exclude the Proposal under Rule 14a-8(i)(7). Ex.F. The Staff stated that the Proposal "relates to, and does not transcend, ordinary business matters." *Id*. As a result, the Team stated it "would not recommend enforcement action to the Commission" if Kroger omitted the Proposal from the 2023 Proxy Materials. *Id*.

55. The Staff's conclusion that there was "some basis" for Company's view that the Proposal could properly be omitted pursuant to Rule 14a-8(i)(7) is wrong for multiple reasons.

56. The Proposal's plain language does not focus on day-to-day business operations. Rather, it deals with a "company-wide" and board-adopted corporate policy connected to these immensely significant social policy issues. Ex.A.3. And the Proposal's focus on Kroger's "company-wide" "human capital management" policy relates not only to employees, but "prospective employees" and "individuals" and concerns the "half of Americans [who] live and work in a jurisdiction with no legal protections" against political activity or viewpoint discrimination." *Id.*

57. The Proposal also clearly pertains to an issue of social policy significance that transcends ordinary business matters. The Proposal focuses on the social policy issues of viewpoint discrimination, the rise of "woke" capital, and its effect of discriminating against Americans based on their political viewpoints. These issues affect and concern millions of Americans and are among the most hotly debated subjects in politics today. Ex.G.17.

58. The Staff's no-action letter was inconsistent with the SEC's and Division's own interpretations of Rule 14a-8(i)(7), which repeatedly make clear that "significant discrimination matters" are the prototypical example of issues that transcend ordinary business operations. 1998 Amendments, *supra*; *SLB 14L, supra.*

59. For example, the Staff previously denied no-action relief to a company for proposal that was identical to the Proposal exception substituted the phrases

"sexual orientation" and "gender identity" for "viewpoint" and "ideology." *See CorVel Corp.*, 2019 WL 1640021 (June 5, 2019); Ex.G.18–19.

60. On knowledge and belief, Kroger continues to hold the position that it will omit the Proposal from the 2023 Proxy Materials.

61. On knowledge and belief, Kroger will transmit the 2023 Proxy Materials to shareholders on or about May 7, 2023.

62. The National Center has previously submitted proposals at other companies that were substantially identical to the Proposal—each of which the Division and Rule 14a-8 Review Team has provided no-action relief under Rule 14a-8(i)(7).[5] The National Center intends to continue submitting proposals that are substantially identical to the Proposal, both to Kroger and to other companies, in future proxy seasons.

## CLAIM

## VIOLATION OF SECTION 14(a) AND RULE 14a-8

63. The National Center repeats and realleges each and every allegation above as if fully set forth herein.

64. The National Center has a right of action against Kroger to enforce Section 14(a) of the Exchange Act and Rule 14a-8.

65. On or about December 21, 2022, the National Center notified Kroger that the National Center was submitting the Proposal and requested that the

---

[5] *See, e.g.*, *BlackRock, Inc.*, 2022 WL 225967 (Apr. 4, 2022); *Salesforce.com, Inc.*, 2020 WL 605941 (Mar. 5, 2020); *Walgreens Boots Alliance, Inc.*, 2020 WL 5656738 (Nov. 12, 2020).

Proposal be included in Kroger's 2023 Proxy Materials as required by Rule 14a-8, which are to be mailed to Kroger's shareholders on or about May 7, 2023. Ex.A.1. The Proposal sought to ensure transparent oversight by Kroger of the risks associated with failing to prevent discrimination against its employees and other individuals on the basis of viewpoint or ideology. *Id.* at 3.

66. As of December 21, 2022, the National Center was the beneficial owner of at least $2,000 worth of Kroger shares, which it had owned continuously for more than three years prior, and intended to hold those shares through the date of the Annual Meeting. *Id.* at 1, 5. Accordingly, the Proposal in all respects satisfied the procedural requirements established by Rule 14a-8 to be included in the 2023 Proxy Materials.

67. On or about February 16, 2023, Kroger informed the National Center that Kroger did not intend to include the Proposal in the 2023 Proxy Materials and sought no-action relief from the Staff with respect to its decision to omit the Proposal. Ex.B.

68. On April 12, 2023, the Staff issued a no-action letter stating that "there appears to be some basis" for Kroger's view that the Proposal may be excluded under Rule 14a-8(i)(7) and that "the Proposal relates to, and does not transcend, ordinary business matters." Ex.F. This determination is erroneous, inconsistent with the SEC's and Division's prior interpretations of Rule 14a-8(i)(7), and is not binding on the Court or the parties, nor entitled to deference. Nevertheless, on information and belief, Kroger continues to intend to exclude the

Proposal from the 2023 Proxy Materials, as is routine when companies receive a no-action letter from Staff.

69.     Kroger's stated decision to omit the Proposal from the 2023 Proxy Materials violates Section 14(a) of the Exchange Act and Rule 14a-8.

70.     On information and belief, Kroger will send the 2023 Proxy Materials to shareholders on or about May 7, 2023.

## PRAYER FOR RELIEF

WHEREFORE, the National Center requests that this Court provide the following relief:

A.     Declaratory judgment that Kroger's decision to omit the Proposal from the 2023 Proxy Materials violates Section 14(a) of the 1934 Act and Rule 14a-8;

B.     Injunctive relief compelling Kroger to include the Proposal in the 2023 Proxy Materials;

C.     An order awarding the National Center its costs of litigation, including reasonable attorneys' fees, pursuant to the common benefit doctrine; and

D.     Any other relief as the Court deems just and proper.

Dated: May 1, 2023                    Respectfully submitted,

/s/ Joseph P. Ashbrook
JOSEPH P. ASHBROOK (0091279)
JULIE E. BYRNE (0085174)
Ashbrook Byrne Kresge LLC
PO Box 8248
Cincinnati, Ohio 45249
Tel: (513) 582-7424
Fax: (513) 216-9882

jpashbrook@ashbrookbk.com
jebyrne@ashbrookbk.com

/s/ Jonathan Berry
JONATHAN BERRY (*pro hac vice* forthcoming)
R. TRENT MCCOTTER (*pro hac vice* forthcoming)
Boyden Gray & Associates
801 17th St NW, #350
Washington, DC 20006
(202) 955-0620
berry@boydengrayassociates.com

GENE P. HAMILTON (*pro hac vice* forthcoming)
REED D. RUBINSTEIN (*pro hac vice* forthcoming)
America First Legal Foundation
611 Pennsylvania Ave, SE #231
Washington, D.C. 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for Plaintiff*